D. Maimon Kirschenbaum
Michael DiGiulio
JOSEPH & KIRSCHENBAUM LLP
32 Broadway, Suite 601
New York, NY 10004
(212) 688-5640
(212) 688-2548 (fax)

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------x
**DIONNE BERNADEL,**

              **Plaintiff,**

  v.

**DAVITA, INC.,**

              **Defendant.**
-------------------------------------------------------x

**COMPLAINT**

**CASE NO.:**

**DEMAND FOR JURY TRAIL**

Plaintiff Dionne Bernadel alleges as follows:

**INTRODUCTION**

1. Plaintiff Dionne Bernadel worked as a Facility Administrator at a dialysis center (the "Facility") in Riverdale, New York for Defendant DaVita, Inc. from November 2018 until August 2020. Ms. Bernadel is a registered nurse and has extensive experience working in the healthcare industry.

2. Throughout Plaintiff's tenure, Defendant underfunded the Riverdale dialysis center that Plaintiff was tasked with managing and operating. Nevertheless, Plaintiff succeeded in providing quality care to the patients at the Facility and in managing the day to day operations of the Facility. During her time as Facility Administrator she substantially increased the Facility's quality index and improved patient experience with satisfactory ratings.

1

3.      Throughout her time working for Defendant, Plaintiff continually complained that Defendant did not provide enough resources to the Facility and that the Facility required more full time and committed staff members. Plaintiff complained because these issues posed a serious threat to the Facility's ability to provide adequate medical care to patients in violation of many state and federal regulations.

4.      Specifically, in the summer of 2020, the Facility lost five licensed medical professionals, out of a team of 15, within a span of a few weeks. Concerned about being able to provide adequate medical care to the patients at the Riverside Facility, Plaintiff requested to her superiors that these positions be filled immediately and that temporary measures be put in place to fill these staffing gaps. Plaintiff's superiors denied her request to immediately fill the positions and downplayed the need to move quickly on finding replacements.

5.      However, without these five staff members, the quality of patient care at the Facility drastically deteriorated and led to dangerous situations where, often, there were not enough medical professionals at the Facility at any given time to comply with the federal and state healthcare regulations including, but not limited to, regulations that required regularly checking patient vitals, maintaining an adequate-licensed professional to patient ratio, regularly cleaning and checking the dialysis equipment, and safely administering patient medication.

6.      Desperate to resolve the staffing issues at her Facility and to ensure that the patients received proper care, Plaintiff contacted Defendants' Human Resources and recruitment department to inquire about obtaining replacement staff members. She was told that there was no additional staff available to help her cover the staffing deficit at the Riverdale Facility and was reprimanded for going outside the normal hiring processes (which she had already tried, to no success).

7. In the spring of 2020, Plaintiff became sick with Covid-19 and was required to take medical leave. Upon her return Defendant, motivated by Plaintiff's diagnosis and use of her sick leave, subjected Plaintiff to increased and unwarranted scrutiny, write-ups, discipline, and harassment, which focused on Plaintiff's complaints regarding staffing shortages at the Facility and the very issues that arose at the Facility that were caused by these staffing shortages. Eventually, this harassment culminated in Plaintiff's termination.

8. On August 11, 2020, a patient at the Facility went into cardiac arrest and Plaintiff, along with another care provider, saved the patient's life and sent them to the hospital. After successfully resuscitating the patient, Plaintiff was called into a conference room at the Facility where her superiors fired her.

9. Defendant's termination of Plaintiff's employment was unlawful because it was motivated by retaliatory and discriminatory intent.

10. Defendant fired Plaintiff because she spoke up about inadequate staffing levels at the Facility (and took steps to solve the problem outside the normal chain of command) and because she fell sick with Covid-19 and took medical leave.

11. Plaintiff's termination was unlawful and she brings this action to seek compensation for her injuries.

**JURISDICTION AND VENUE**

12. Plaintiff Dionne Bernadel brings this action against Defendant DaVita, Inc. alleging retaliation claims under the New York Labor Law §§ 740 and 741, the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq*., and the New York City Human Rights Law ("NYCHRL") Admin. L. §§ 8-101 *et seq.*

13. This Court has original federal question jurisdiction under 28 U.S.C. § 1331 because this case is brought under the FMLA. This Court has supplemental jurisdiction over the New York state law claims, as they are so related to the claims in this action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

14. Separately, this Court has subject matter jurisdiction over all the claims under 28 U.S.C. § 1332(a)(1) because the parties are citizens of different states and the amount in controversy exceeds $75,000. Plaintiff is a citizen of New York State and the Defendant DaVita, Inc., is a citizen of the State of Delaware, where it is incorporated, and the State of Colorado, where it has its headquarters.

15. Venue is proper in this District because Defendant conducts business in this District, and the acts and/or omissions giving rise to the claims herein alleged took place in this District.

## PARTIES

16. Defendant DaVita, Inc. ("Defendant" or "DaVita") is a publicly traded corporation with its principal office located at 2000 16th Street, Denver, CO 80202.

17. Plaintiff Dionne Bernadel ("Plaintiff" or "Ms. Bernadel") was employed by Defendant as a Facility Administrator from November 26, 2018 until August 11, 2020, when she was terminated.

## FACTS

18. Defendant DaVita committed the acts alleged in this Complaint knowingly, intentionally and willfully.

19. Plaintiff began working at DaVita as a Facility Administrator on November 26, 2018.

20. DaVita assigned Plaintiff to manage and run a dialysis center in Riverdale, New York (the "Facility" or the "Riverdale Facility").

21. Plaintiff was successful in managing and operating the Riverdale Facility.

22. The Riverdale Facility was notoriously difficult to manage. In spite of this reality, over the course of her employment with Defendant, she significantly increased the Facility's patient satisfactory ratings and was recognized publicly for these accomplishments.

23. For the majority of Plaintiff's time working for Defendant, she managed the Facility successfully, even though Defendant provided her limited resources to do so.

**Plaintiff Raises Staffing Concerns**

24. In January 2020, staffing issues arose at the Riverdale Facility, and Plaintiff had trouble ensuring that there were enough licensed medical professionals on each shift to ensure that patients received adequate care and that the Facility complied with state and federal regulations.

25. Plaintiff knew that these staffing shortages caused the Facility's care to fall below what was legally acceptable and created an unsafe health environment and put the patients at the Facility at risk.

26. Motivated by a concern that the Facility was breaking the law, on January 13, 2020, Plaintiff emailed Kristin Brickel, Plaintiff's Regional Director, and Penny Kiraly, Plaintiff's direct supervisor, to inform them that the Facility needed more staff members, describing in detail all of the staffing issues at the Facility, along with insight and analysis about how to approach the problems.

27. Plaintiff, motivated by a concern that the Facility was operating in an unlawful manner, raised these concerns with her supervisors because she understood that a shortage of medical professionals at the Facility causes dangerous situations where, often, there is not enough medical professionals at the Facility at any given time to comply with the federal and state healthcare regulations including, but not limited to, regulations that required regularly checking patient vitals, maintaining an adequate licensed professionals to patient ratio, regularly cleaning and checking the dialysis equipment, and safely administering patient medication.

28. However, despite these concerns, Ms. Brickel and Ms. Kiraly brushed off Plaintiff's request, and directed her to manage and operate the Facility with the resources that she was allocated.

29. Considering that the Facility was under-resourced, the quality of Plaintiff's work remained very good. In February 2020, Plaintiff was publicly recognized within DaVita for exemplary improvements in the Facility's patient satisfaction ratings.

30. However, the staffing issues were so bad at the Facility that throughout February 2020, Plaintiff was essentially on call indefinitely to cover any staffing issues that arose. Plaintiff continued to verbally raise the staffing issue with her superiors at her routine check-ins and meetings.

31. On February 20, 2020, Plaintiff again raised her concerns regarding staffing and Defendant's inaction. Plaintiff's concerns included issues related to: a float pool of per diem nurses, the potential of providing incentive compensation for willing nurses to fill staffing holes in the Facility, Defendant's unreasonable expectation of requiring Plaintiff (the Facility's administrator) to step in personally to support dialysis technicians when short staffed, and Defendant's policy of not extending contracts for agency nurses during a periods of significant

staffing challenges, which prevented Plaintiff from being able to schedule enough licensed staff to adequately cover the Facility while a permanent solution was implemented.

32. In March 2020, Ms. Kiraly met with Plaintiff, and reprimanded her for being late to meetings and for not accounting fully for her time. Plaintiff explained to Ms. Kiraly that she was usually on time to meetings, but when Plaintiff was late, it was due to the fact that the Facility was under-staffed and she was working on the clinic floor assisting staff and patients. Essentially, Plaintiff was reprimanded for trying to fill the staff gaps caused by Defendant's unwillingness to allocate adequate resources to the Facility.

### Plaintiff Takes FMLA Leave

33. In March 2020, Plaintiff contracted the novel coronavirus, Covid-19 and requested to take FMLA medical leave.

34. Defendant eventually authorized Plaintiff's FMLA leave from March 24, 2020 through May 3, 2020.

35. During this time, Plaintiff applied, and was approved, for short-term disability benefits.

36. During her leave, Plaintiff was extremely sick with Covid-19 and continues to have lingering effects from the disease to the present day.

37. When Plaintiff returned from her FMLA leave in May 2020, Defendant's treatment of Plaintiff changed dramatically.

38. Upon her return, Defendant subjected Plaintiff to unwarranted scrutiny, write-ups, discipline, and harassment, which focused on Plaintiff's complaints regarding staffing shortages at the Facility and the very issues that arose at the Facility that were caused by these staffing shortages.

39. Specifically, immediately upon returning to work, Plaintiff's supervisors gave her a "final written warning" for issues that had arisen during Plaintiff's leave, and over which she had no control. Plaintiff had never been given a written warning for any other issue before.

40. As part of this "final written warning," Plaintiff was demerited for "not appropriately staffing" the Facility. However, this was precisely the issue that Plaintiff repeatedly raised with her superiors throughout 2020. This issue was left unaddressed by Defendant while Plaintiff was on leave, sick with Covid-19.

41. Defendant's decision to reprimand and discipline Plaintiff for issues that were out of Plaintiff's control because Plaintiff was on FMLA leave was clearly made in retaliation for Plaintiff taking leave and for Plaintiff complaining to Defendant about the lack of resources. Defendant blamed Plaintiff for their failure to provide the necessary staffing resources at the Facility.

42. Plaintiff complained to her superiors and to Defendant's Human Resources department about the final written warning and her unfair treatment. Plaintiff explicitly complained that she had been singled out because she took FMLA leave, was diagnosed with covid-19 and for spoke up about the staffing issues.

43. After Plaintiff returned from FMLA leave in May 2020 until her termination in August 2020, her superiors routinely verbally disrespected her in meetings, ignored her requests for staffing adjustments, and treated her more harshly than other Facility administrators.

### **Plaintiff Continues to Complain About Staffing Shortages**

44. Upon her return to work, Plaintiff again began raising the alarm about the lack of adequate staffing at the Facility.

45. Plaintiff believed that the staffing issues at the Facility were causing violations of Defendant's internal protocols and policies and violations of New York State and Federal regulations governing the operations of dialysis centers, such that Defendant provided improper quality of patient care to patients at the Facility.

46. Plaintiff raised the staffing issues with her supervisors because she knew the Facility was in violation of the law.

47. On May 6, 2020, Plaintiff complained to her supervisors about the lack of adequate staffing at the Facility.

48. A few of the licensed medical professional staff members at the Facility had contracted Covid-19 and could not work. In addition, there were issues with Plaintiff's authority to retain per diem hires for full time work. Plaintiff provided a detailed account all of the issues with each staff member and discussed both temporary fixes to cover the day to day in the short term as well as long-term solutions to put the Facility on a more stable staffing foundation going forward.

49. Defendant's response was non-committal and instructed Plaintiff to resolve the issuing using per-diem practitioners, overtime hours for the limited numbers full-time staff, and to go through the time-consuming normal hiring process.

50. In early June 2020, frustrated with the lack of progress and concerned about the Facilities compliance with internal policies and the governing regulations, Plaintiff again reached out to her superiors regarding staffing issues at the Facility. In an attempt to solve the staffing issue at the Riverdale Facility on a quick timeline, Plaintiff requested for a renewal of a 13-week contract for a nurse who had been working at the Facility on a travel contract. Defendant declined to renew the contract despite the overwhelming need.

51. Plaintiff also made a request for increased compensation for per diem nurses, who are personnel that had all of the qualifications necessary to hold full time positions, but were leaving for other, higher paying jobs. Defendant declined to accept Plaintiff's suggestion.

52. Plaintiff also made several requests to approve specific patient care technicians to work per diem because the Facility was in desperate need of these workers and because the full-time staff at the Facility was grossly over worked. Plaintiff was concerned that tired and overworked patient care technicians would put patient health at risk and was causing the Facility to violate state and federal healthcare regulations.

53. Plaintiff's supervisor told Plaintiff that the per-diem personnel had not been approved by the relevant committee and that she would have to wait a few weeks before a decision would be made.

54. In order to keep the Facility operating as best as she could, Plaintiff ordered the remaining staff members at the Facility to work overtime to ensure that the Facility could operate, if only with a skeleton crew. Plaintiff's staff members stepped up to the challenge and worked long hours. However, the team was stretched thin, and the staff members working overtime were overworked and tired, which, again, jeopardized the quality of patient care.

55. By late July 2020, the Facility lost five licensed medical professionals, out of a team of 15, in a matter of weeks – Defendant transferred one registered nurse because of poor performance issues, two patient care technicians died unexpectantly, one patient care technician re-located to Florida, and one patient care technician resigned to take a better paying position with a different medical care provider.

56. These loses was significant for the Riverdale Facility and compromised the care that patients received at the Facility.

57. Plaintiff again contacted her supervisors to update them on the staffing vacancies at the Facility and to request that Defendant provide full time replacements for the Facility immediately because she was concerned that the lack of staffing was causing health risks to the patients at the Facility and violating the law.

58. Plaintiff's supervisor's responded by instructing Plaintiff to go through the normal hiring process to fill the vacancies, even though this process can take months to complete.

59. Frustrated with Defendant's habitual slow and ineffective responses to the Facility's staffing needs (and concerned about how this lack of staffing was causing health risks to patients and legal violations), Plaintiff decided to be more pro-active in her approach to solving the staffing issues at the Facility.

60. Plaintiff was aware of an individual who was an experienced dialysis technician and who would not require much training once hired because Defendant's had already approved them for work through Defendant's training process. Defendant had interviewed and approved this candidate for hire while Plaintiff was out on medical leave. Plaintiff interviewed this person and also felt the candidate would be a great fit for the Facility.

61. In or around August 4, 2020, Plaintiff reached out to Defendant's human resources department via email to see whether this individual could be offered the position to be assigned to the Riverdale Facility.

62. Defendant's human resources department replied to Plaintiff's email, including Sharon Greico and Sumeet Rama, two of Plaintiff's supervisors, on the correspondence, and told Plaintiff to discuss the issue with Plaintiff's supervisors and to go through the normal hiring process.

63. In response, Ms. Ranna reprimanded Plaintiff for trying to hire someone outside of the normal process and suggested that the individual Plaintiff sought to hire did not have the necessary approval for the position.

64. However, Ms. Ranna was misinformed or willfully ignorant of the circumstances. The individual that Plaintiff requested to be considered for the Riverdale Facility was qualified, very experienced, was looking for a full-time employment at DaVita, and had gone through the necessary training process.

65. In spite of Plaintiff's efforts to ensure adequate staffing at the Facility, from June through August 2020, the quality of patient care continued to deteriorate at the Riverdale Facility due to these chronic staffing issues.

66. This problem led to dangerous situations where, often, there were not enough medical professionals at the Facility at any given time to comply with the federal and state healthcare regulations including, but not limited to, regulations that required regularly checking patient vitals, maintaining an adequate licensed professionals to patient ratio, regularly cleaning and checking the dialysis equipment and water quality, and safely administering patient medication. At times, Plaintiff observed staff forgetting to conduct important water quality and systems checks because they were tired, overworked, and understaffed. This situation clearly compromised patient safety.

67. Plaintiff had repeatedly complained that the inadequate number of medical professionals at the Riverdale Facility created a long que of patients such that each patient had to wait many extra hours before receiving their dialysis services.

68. The staffing issues led to violations of Defendant's internal protocols and policies such that Defendant provided improper quality of patient care to patients at the Facility.

69. The staffing issues led to violations of New York State and Federal regulations governing the operations of dialysis centers such that Defendant provided improper quality of patient care to patients at the Facility.

70. The staffing issues led Defendant to violate state and federal regulations such as, among others, regulations that required regularly checking patient vitals, maintaining an adequate licensed-professionals to patient ratio, regularly cleaning and checking the dialysis equipment, and safely administering patient medication.

71. Plaintiff had a good faith and accurate belief that the staffing issues at the Riverdale Facility were causing violations of state and federal law and providing patients with improper and inadequate care.

**Plaintiff's Termination**

72. In early August 2020, soon after Plaintiff directly contacted Human Resources in an attempt to fill staffing positions, Plaintiff took a few days of paid time off work to rest and focus on her health. Plaintiff's health had never fully recovered after her Covid-19 diagnosis.

73. On August 11, 2020, the day Plaintiff returned to work, a patient at the Facility went into cardiac arrest and Plaintiff, along with another nurse, saved the patient's life and sent them to the hospital for further treatment.

74. On the day of that incident, only one nurse was working at the opening shift at the Facility. When Plaintiff (along with another supervisor) arrived, they provided additional assistance to that nurse. There were many patients at the Facility that day whose health were in jeopardy due to the lack of staff. The staffing issues on this day were typical of staffing issues at the Facility during this time.

75. After successfully resuscitating the patient, Plaintiff was called into a conference room at the Facility where her superiors informed her that she was being terminated.

76. Defendant claimed that they were terminating Plaintiff because her performance was not meeting their standards. Plaintiff was not provided with any supporting evidence or justification of inadequate performance at the time of her termination.

77. To the extent that the Defendant claims that the state of the Facility was inadequate, this was a direct result of Defendant's decision to ignore the staffing issues that Plaintiff repeatedly raised with her superiors, since at least early 2020. When the situation had become dire, Plaintiff took additional and active steps to fill vacant positions, which her superiors rejected at every step.

78. Throughout 2020, Plaintiff had continually complained to Defendant that the Facility was under resourced. Plaintiff complained because the staffing shortages caused significant risks to the health and safety of the public, caused the Defendant to provide improper patient care, and caused the Defendant to violate state and federal healthcare regulations.

79. After Plaintiff fell sick with Covid-19 and took FMLA leave in May 2020, Defendant subjected Plaintiff to unwarranted scrutiny, write-ups, discipline, and harassment, which focused on Plaintiff's complaints regarding staffing shortages at the Facility and the very issues that arose at the Facility that were caused by these staffing shortages.

80. After Plaintiff fell sick with Covid-19 and took FMLA leave, Defendant increased their scrutiny of Plaintiff's actions, including her attempts to speak up about inadequate staffing levels at the Facility. Defendant fired Plaintiff because she fell sick with Covid-19, took FMLA leave, and complained about the unsafe, dangerous, and illegal staffing situation at the Facility. Her termination was unlawful.

**FIRST CLAIM FOR RELIEF**
**(Family and Medical Leave Act, 29 U.S.C. § 2615 – Retaliation)**

81. Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

82. In violation of 29 U.S.C. § 2615, Defendant intentionally and willfully retaliated against Plaintiff by subjecting her to unwarranted discipline and terminating her employment because she took protected leave under the FMLA.

83. Defendant's conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily-protected civil rights.

84. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial monetary damages, including, but not limited to, loss of income, including benefits, past salary, and lost wages.

85. As a result of Defendant's unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to lost wages, back pay, lost benefits, restitution, emotional distress damages, liquidated damages, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper.

### SECOND CLAIM FOR RELIEF
**(Family and Medical Leave Act, 29 U.S.C. § 2615 – Interference)**

86. Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

87. In violation of 29 U.S.C. § 2615, Defendant intentionally and willfully interferend with Plaintiff's right to take protected leave under the FMLA.

88. Defendant's conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily-protected civil rights.

89. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial monetary damages, including, but not limited to, loss of income, including benefits, past salary, and lost wages.

90. As a result of Defendant's unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to lost wages, back pay, lost benefits, restitution, emotional distress damages, liquidated damages, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper

## THIRD CLAIM FOR RELIEF
**(New York Labor Law § 740 – Retaliation)**

91. Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

92. In violation of Section 740 of the New York Labor Law, Defendant intentionally and willfully retaliated against Plaintiff by terminating her employment because she complained about, and took actions to redress, staffing issues at the Facility that were causing violations of law and creating a substantial and specific danger to the public health or safety.

93. Defendant's conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily-protected civil rights.

94. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial monetary damages, including, but not limited to, loss of income, including benefits, past salary, and lost wages.

95. As a result of Defendant's unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to lost wages, back pay, lost benefits, restitution, emotional distress damages, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper.

**FOURTH CLAIM FOR RELIEF**
**(New York Labor Law § 741 – Retaliation)**

96. Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

97. In violation of Section 741 of the New York Labor Law, Defendant intentionally and willfully retaliated against Plaintiff by terminating her employment because she complained about, and took actions to redress, staffing issues at the Facility that were constituted improper quality of patient care.

98. Defendant's conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily-protected civil rights.

99. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial monetary damages, including, but not limited to, loss of income, including benefits, past salary, and lost wages.

100. As a result of Defendant's unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to lost wages, back pay, lost benefits, restitution, emotional distress damages, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper.

**FIFTH CLAIM FOR RELIEF**
**(New York City Human Rights Law, N.Y. Admin. L. §§ 8-101 *et seq* – Disability Discrimination)**

101. Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

102. In violation of the NYCHRL, Defendant discriminated against Plaintiff on the basis of her disability – contracting and suffering from Covid-19.

17

103. As a direct and proximate result of Defendant's discrimination against Plaintiff, Plaintiff suffered, and continues to suffer, substantial monetary damages, including, but not limited to, a loss of income and employment benefits.

104. As a direct and proximate result of Defendant's discrimination against Plaintiff, Plaintiff suffered, and continues to suffer, substantial non-monetary damages, including but not limited to, emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputations, lasting embarrassment, humiliation and anguish.

105. As a result of Defendant's unlawful conduct, Plaintiff is entitled to compensatory damages, including, but not limited to, backpay, lost employment benefits, and damages for emotional distress, as well as front pay, punitive damages, post-judgment interest, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendant as follows:

(A) For compensatory and liquidated damages in an amount to be determined by the trier of fact;

(B) For reasonable attorneys' fees, interest, and costs of suit;

(C) For such other and further relief as the Court may deem just and equitable.

Dated:  New York, New York        Respectfully submitted,
December 7, 2020

                                               JOSEPH & KIRSCHENBAUM LLP

                                               By:
                                             <u>*/s/ Michael DiGiulio*</u>
                                             Michael DiGiulio
                                             D. Maimon Kirschenbaum
                                             32 Broadway, Suite 601
                                             New York, NY 10004
                                             Tel: (212) 688-5640
                                             Fax: (212) 688-2548

                                             *Attorneys for Plaintiff*

## **DEMAND FOR JURY TRIAL**

      Plaintiffs hereby demand a jury trial on all causes of action and claims with respect to which they have a right to jury trial.